We see that. Thank you. Will the court please call the next case? 3.20305 Denise Kitton v. Michelle Atkinson Appellant by Daniel Deneen v. Linda Volkman Appellant by Thomas Hanna Mr. Deneen, you may proceed. May it please the court, counsel. This is a simple case. This case involves fraudulent self-dealing by Linda Volkman that totaled over a quarter million dollars. Linda covered up her tracks by not documenting what happened. Linda adopted a Stalingrad defense in litigation. The statements by Judge Hedl and the nature of the case with cites to the record provided by Mr. Garwood in the response to objection and motion to strike that was filed are irrefutable as to breaches of fiduciary duty by Linda Volkman. I would like to comment on five areas of error involving the law where we don't believe it was followed. And I'll finish with a discussion on damages. And those are going to be centered on undocumented gifts that Linda called loans, comingling, a cash stash with no records, and undeposited retirement checks. My prepared comments will be under 10 minutes since you have our written argument, the transcript of our oral argument, the last two transcripts, actually, our brief and our reply. Error of Law 1 relates to Linda's fiduciary and power of attorney status. There can't be any dispute that Linda became a fiduciary in June of 2012 when she was named as an immediate power of attorney agent. We cited the trial court to Garulis, G-E-R-U-L-I-S, a third district case, I hope I'm not butchering it too much, multiple times along with other cases. If you go to our brief, pages 21 to 24, it lists cases in accord with Garulis. Fiduciaries do not determine when the relationship began. Within this area, Linda clearly became a power of attorney agent on August 27, 2013, when she signed a copy of the power of attorney and a bank signature card. Joyce's move to assisted living in September of 2016 was irrelevant for POA status. Linda's belief she was not acting was irrelevant. Linda handled this bank account as well as others, but with this bank account, she wrote checks over the next several years for illegal loans to her children. It gets into the question, if Linda was not acting as a power of attorney agent under this account, what authority did she have? If she had no authority, then she misappropriated the funds, which is a violation of the Financial Exploitation Act, 720-ILCS-5-17-56, which is a basis of one count. Law error two. Judge Heddle could have and should have awarded attorney fees. Judge Heddle's order dated June 6, 2022, approved by Linda's attorneys, stated he would award attorney fees for reasons on the record, which were, of course, reduced in the nature of the case. However, he reversed himself off the record and refused to award attorney fees, declaring he couldn't, although he wanted to. That is in the record on page 837. The statement Judge Heddle couldn't award attorney fees was clearly wrong under the Power of Attorney Act, the Financial Exploitation Statute, the common law involving equity and restitution, and two cases from the Third District that I called the judge's attention to, those being Glass v. Burkett and Talty, which cites Glass v. Burkett and discusses punitive damages. The American rule kept being brought up. It has no place in this fiduciary fraud litigation. It comes down to, as a matter of law, Judge Heddle could have awarded attorney fees, and he should have. We cited briefly in our brief for the reply the statement that when a judge is mistaken and thinks he has no authority, that is grounds for reversal. The third error of law was that he ignored the failure to account. 27A of the Power of Attorney Act, affirmed in the Notice to Agents, states that agents shall account, not should account. This includes contemporary his records and being able to piece everything together so that someone can figure out exactly what took place. Judge Heddle properly found the trial was the accounting. So there was no accounting provided by Lynda. We found that there were two documents that were called accountings, but they were not really evidence because they didn't bring their witness on them, and we could tell you some deficiencies in those documents. Even internally, they contradicted, including the loans for one of the children. The nature of the case statements in our brief highlights there was no accounting. We cited the court to Nonnast, N-O-N-N-A-S-T, an Illinois Supreme Court case numerous times, in writing and orally for the clear result that all presumptions and inferences are against a fiduciary who does not account for his or her conduct. We had no accounting from Lynda. All inferences and presumptions should have been against her, especially on damages. Law error four. Lynda's failure to produce witnesses was disregarded. The record speaks for the circumstances as to why we didn't get the phantom accountant's testimony. However, the main point is that Lynda should have brought the accountant that Joyce paid about $5,000 to to trial to testify as to exactly what was taking place. And because she didn't bring her expert witness, we cited to the IPI instructions in the case that says, you need to presume that the testimony would have been prejudicial against Lynda Volkman. Lynda also didn't call a Heartland Bank representative to testify as to how the numbers in their inventory were calculated. So the court had Lynda's testimony, which of course was self-serving, and it's referenced some of it's from memory. You have the seed corn books that don't say much at all. You have the two accountants' statements that don't have the same numbers and change. And then you finally have Heartland Bank says, okay, they've conceded these amounts. We believe it was an error as a matter of law for the court just to say, well, I'm relying upon Heartland Bank without Lynda calling someone from Heartland Bank to say, okay, you admit these amounts are due. How did you calculate it? I mean, the only piece of paper that was relevant was there was a loan to Michael Volkman prior to when Lynda took over that was reduced to a promissory note. There was no promissory notes. There weren't even contemporaneous records of loans. There were checks, and then there was an admission, well, I gave him cash some. That was the accounting. And there's a presumption at law if there's a transfer from a person to their relative, it's presumed to be a gift unless something contrary is shown. That's why I keep saying these are gifts that became loans. And Heartland Bank was the party who did that. Not Lynda, not anybody else. So the inference should have been that for the loans, the amounts were too little, including there's testimony by Michael that, no, the loan was for $110,000, not $100,000, so there's at least a $10,000 error there also. The last area, and the one jurisprudentially that's the one I expect you might question me on, was that the presumption of fraud for a fiduciary was not properly applied. Lynda had to overcome the presumption of fraud for the loans, the commingling, which is an individual account and several joint accounts and a joint CD, undeposited retirement checks over the course, where we tracked from 2015 on of it, and the undocumented cash by clear and convincing evidence. Franciscan versus Dean is the building block case. We've cited numerous cases interpreting Franciscan as to the quantum of evidence necessary to burst the bubble when there are clear violations of fiduciary duties. I had to look through that closely since it was 43 years since I had an evidence class in law school trying to figure out what was going on. Three cases point out that strong evidence is required. Those are Reibolt, R-Y-B-O-L-T, Teal, T-E-A-L-L, and DeJarnett. They point out that strong evidence is required. You should also look at your case of Garulas at paragraph 38 where it states that she needs to show that there was good faith. Reibolt and the other cases also discuss the necessity of disinterested witnesses. The presumption bubble is not burst by self-serving statements such as, I didn't benefit, mom wanted me to make loans, and she was a depression baby. It's not burst when there is no accounting and few documents support a plea for leniency. It's not burst when a party's expert witness doesn't come to testify. And the presumption bubble is not burst when disinterested witnesses don't testify. There are no disinterested witnesses. It's Linda and her family, as you saw on the record, after a conference with Thomas McClintock. Counsel, when you say her expert opinion, was that the accountant that you're referring to? Yes. You subpoenaed them? Yes, Brian Garwood. Did you perfect service of the subpoenas? There was no perfection of service, although Mr. Garwood did have conversations with the office, as did Mr. McClintock's office. It's in the billing records that Mr. McClintock did contact her office. But, you know, the main thing, as we talked about there, the main thing is she should have brought an expert witness to testify and not having us do it. We filed a motion in limine relying on the dead man's act that the judge didn't pick up. He didn't consider it. Counsel, what action did you take to set it for hearing and insist on a ruling on the motion in limine? We didn't insist upon it. It was before the court. The court just says, I'm not going to hear it, I believe. Mr. Garwood reviewed the record more closely than I did. We didn't press the issue because we didn't, for one thing, we didn't think the testimony of an elderly woman with progressive dementia, as set forth in our brief at the start, would mean too much as to, I mean, if you look through the testimony, some of the testimony was this lady that they're relying upon didn't know how much she owned. She said, can I make this loan? And, you know, it didn't mean much, especially if you balance that against one of the daughters-in-law saying, I don't like this happening. So we didn't press the issue. We were just trying to get to trial. So the motion for in limine, therefore, was waived. It was just not entertaining. I don't know the exact language that he used, but that's a minor point. As I said, just because the dead man's statements, number one, is from a person with dementia, number two, dead man's act is there just because those statements are considered to be unreliable. Even if the presumption was first, the cases that we've cited to, including one that Mr. McClintock cited to, I believe, just states the inferences are there. So you need to weigh some of the evidence that was before as to the pattern that we were able to glean. So we get to the primary issue, and that needs to be addressed, is the damages that weren't awarded, as I said, failure to keep contemporaneous records, failure to account, illegal loans, conflicts of interest, commingling. These weren't just administrative deficiencies. All presumptions were against Linda. As discussed, attorney fees could have been awarded, and they should have been. Counsel, with regards to the damages, in my review of the record, I didn't find a clear presentation of damages. What are you asking for? What we're asking for is, on the loans, find that the conceit level. We could not quantify the damages because we had no record. Well, if you can't quantify the damages, how's the court supposed to do that? The court should punish Linda and look at what is in the evidence. For the loans, not just $218,500, that's what was conceded. Round it up some. It's not a huge amount more or we would have found it, but something there or it would have leaked from the system. No money came out of Ameriprice. For the cash, the accounting started at zero. It went down to $23,000 negative. Well, you can't overdraw cash that isn't there. There was testimony. There was $10,000 in a purse, $10,000 at the home, $10,000 in a safe. She needed to account for it. She just used it. She even admitted she cashed checks and put them in the cash and then took it out and kept no records. For the retirement account checks, we would estimate that's not less than $50,000. Well, counsel, the court can't go on estimates. I mean, you have checked. Have you done a calculation? Have you had an accountant do a calculation of how much? We asked Linda. But who was asking the court for money for a judgment? In these cases, it's flipped. She needs to come and account. If she doesn't account, the presumption is she's hiding something. Well, but the court, she's hiding what? You have to give the court something to go on. We provided the court with evidence that every month there was a check from Teacher Retirement Service and a check from Social Security. For the period of the accounting, we discovered that I believe it was nine checks were not deposited into the bank accounts in the accounting or were not listed as going to cash. So that was nine checks. That was reduced to six checks when Linda said, well, some of these checks I cashed and gave to my son for a loan. And so you can't double-cut those. So from September of 2016 through the end of the accounting, there were at least six checks that weren't accounted for. And what are they totaled to? It should be in the record. I'm thinking that would be roughly $2,500 to $3,000 apiece. Right. So we're talking four times that sum, right? Yeah, we're talking, yeah. About $10,000. No, there were six checks that weren't accounted for. So $15,000 to $20,000 is a rough estimate. That does not go back to the start of 2015. Linda refused to account until Ma moved to assisted living, saying I wasn't a POA. The record shows we tried to get in there and then we stipulated. We tried to prove that. Wait, you stipulated and then you changed to we tried. You stipulated to what? Denise stated and threw me that she reviewed the bank records and she saw deposits that would approximate the checks that went in. And then we had an approximate number of the checks from January 2015 through August 2016 that didn't end up in Joyce's bank accounts. So we've got inferential argument evidence of about 15 to something? Yeah, for the first 2016 on, 15 to 20,000, I believe it was about another five or six checks in the 16 months ahead of time that we asked Linda to account for and she did not. Okay, so we understand the presumption, bursting the bubble, whatever. But back to my colleague's questions, what's the evidence here of these damages? What are you seeking? The retirement checks? For the checks, $25,000. Right, what else? Cash, $30,000. It was cash in, cash out. The loans rounded up by 25% maybe to $250,000. Where does the 25% come from? Because we cannot quantify. That's just my estimate. What allows the court ever to round up? You could include it as punitive damages because she failed to account. And because she failed to account, she can't say, well, I concede that only $218,000 is due. Was there any evidence induced at trial as to your suggestion of 25% as punitive damage? No, there is no evidence at trial. That is my suggestion. The judge said that she put up roadblocks. We couldn't figure out what she did. And Judge Heddle couldn't figure out what she did. So I'll be real brief since my time's up with the questions. Just first, under the Financial Exploitation Act, we believe that the cash and retirement checks that were never deposited in Joyce's bank accounts were misappropriations. We believe that the transfers called loans to Linda's family members that depleted Joyce's bank accounts, the cash stash and the retirement income, were also misappropriation. And we're asking for treble damages there. We're asking for attorney fees. There's a petition for fees on file that he said couldn't be awarded. For punitive damages, we believe that the conduct was reprehensible. You have Judge Heddle's statements as to how she was such a bad fiduciary. You have the testimony that she showed no remorse for what she did. You have her testimony blaming her elderly mother for the illegal loans, the missing checks, and the missing cash. And we believe punitive damages should have been awarded, including the attorney fees as is set forth in Glass v. Burkett and Colton. Thank you. Thank you, Mr. Deneen. Unless you have any further questions at this time.  Okay. Thank you, Mr. Deneen. You'll have time to reply. Mr. McLennan, you may respond. Thank you, Your Honor. Good afternoon. May it please the court and counsel. As you have heard, the gist of the complaint against my client, Linda Volkman, is that she used the power of attorney over property, which she had over her mother's Joyce v. Zane, and she used that power and that authority to enrich herself and to enrich her kin, and that she thereby depleted part of the estate of her mother. They say depleted, but actually it was a several-million-dollar estate. So the loans and some of the things we're talking about here certainly didn't deplete her estate. And the thrust of their argument does center on these two main issues, and that was the loans to Linda's adult children. Linda wrote out the checks for those. And also the missing Social Security and retirement checks, which could not be traced as a direct deposit or as a deposit into Linda's account. The evidence at trial, however, showed that Joyce, Zane, had been making interest-free, note-free loans to family members since the 1970s. In fact, some of those interest-free loans were made to the petitioners themselves, to their spouses, to their brother, to their sisters. And now they complain that Joyce is making loans to the grandchild. Was there any evidence or a record about the administration of the estate? Wasn't there a provision that these loans were to be taken away from the respective shares? Right, there was a provision in Joyce's will that specifically said during my lifetime I've made loans to my family members, and in the event of my death, if there's still outstanding balances, those shall be deducted from any inheritance that they would receive. How would an administrator of an estate be able to do that? To come up, the executor of the estate, obviously, administrator, would be given the responsibility in the Probate Act to make those adjustments in the distribution of the estate. Right. And how is that going to be done without an accountant? Well, there is an accountant. The court found that the amounts of the loan—let me back up. Joyce was kind of a product of the Depression. I don't know if you've ever been to a county fair, but at county fairs the grain dealers give out these little seed books, and Joyce had the habit of whenever she would advance a loan, she had a book for every one of the family members, and in there she'd make notations as to the amount of the loan that was given. Those amounts were proved at trial to be accurate. There was a temporary guardian brought in a bank, and they accepted those numbers, and then Joyce eventually passed away, and those were listed in her estate as loans, and they were repaid. Wasn't there conflict between— didn't one of Linda's children testify to an amount that was higher than— the loan was higher than was reflected in the seed book? There was some testimony to that effect, and I think that was clarified later where he thought that maybe he was mistaken in that. He said he wasn't quite sure. He thought maybe it might have been a larger amount that was in the book. There was some other testimony during the trial that some other people thought it was less than the amount that was in the book, but ultimately the trial court and the testimony of all the other loan people confirmed that the amounts were fairly—were accurate. Okay. Let's talk about the Social Security checks and the retirement checks. It's true that when you went back— hundreds of dollars pouring over bank records looking for these checks to be deposited in an account in Linda's name or an account in Linda's family's name, it never really happened. The testimony was that Joyce was a product of the Depression. She liked to have cash on hand. Testimony was she was out someplace, and she had shopping, and she had $3,000 in cash in her purse. Another occasion, she had $10,000 in her possession, and there was even a safe in Linda's house where she would keep cash on hand. And so occasionally when Joyce would go to the bank or when Linda and Joyce would go to the bank, Joyce would cash these checks, take the cash, take it home, and put them in the safe because she wanted that security of having cash on hand. There was never any evidence at all that any of this cash was ever diverted. The court considered the evidence. There was some question about that the trial judge hurried things along, but this was an eight-day trial, and at the end of that eight-day trial, the trial judge found, quote, judging these facts, she, Linda, did not in fact benefit, take, enjoy in some way the property of her mother. And because he so found that, the court determined that the mother's estate had not been depleted in any amount of money. And so the court therefore denied attorney's fees. The issue of attorney's fees is controlled by statute 755 ILCS 45-2-7F, and that statute requires a violation of the act, some type of wrongful conversion, some nefarious act that reduces the estate. And so the court then finds that a petitioner comes in, and proves that to the court, proves with clarity the amount of money that's missing from the estate, and orders the restitution to make the estate whole. Then you get your attorney's fees. You need a violation, and you need a diminution of the estate. If I understand the opposing counsel's position correctly, and I may not, we have Linda with the power of attorney. The law is saying she becomes, given those powers, has those powers from the day she signs that POA. That's not true. Okay. You can rebut that then. But the point is that I think he's trying to make is the presumption that an accounting is due, and if an accounting is not forthcoming, there's a presumption of fraud. Do you agree with that summary of the law? Well, I agree that the act requires certain duties. I agree that when one makes a loan to a family member, there could be a presumption. But actually, the evidence in this case was every one of these individuals went to Joyce, and specifically asked her for the loan. And then she would tell Linda, do I have enough money to make the loan? And yes, Mom, you do. She said, well, give me the loan. She never turned anybody down. All Linda did was write out the checks. Okay. Going back to the first issue. Did she hold the power of attorney at that time? She did at that time. Did she have a duty to do an accounting at that time? She did do an accounting. It wasn't satisfactory to them, and the court was a little critical of it because the accounting included little field seed books with handwritten pencil notations in them. These are lay people. They're not accountants. It's the same thing. It's just the technology is different. Well, true. And when you do estate planning, you go to your lawyer, you go to your family lawyer, and you say, you know, I want to make out a will. And he or she says, you better make out a power of attorney at the same time. So I do. I name one, and I name a successor. Okay. They very well don't even know that they've been named. And until and unless I begin to act under that authority, only then does the fiduciary obligation arise. Were there any loans made to Linda's children after her mother's death? No. As I said, she approved every loan. Now, I believe that, going back to the issue of the attorney's fees, and we researched this very carefully, and there's no case out there where attorney's fees have ever been awarded in a situation like this unless there's some proof that there's been money wrongfully diverted, some nefarious act that was a conversion, a wrongful conversion of the funds. And the petitioners admit that on page 27 of their brief, page 5 of their reply brief, when they state that they were unable to quantify damages. In short, the petitioner's lawsuit was unsuccessful, and they've alleged in their brief that they lost the case because the trial judge did not know the law, the trial judge ignored facts, and even went so far as to say that the trial judge had made up his mind before he ever heard any evidence at all. Personally, that's an insult to a very respected jurist. Let me take on the front with that. You know, in my estimation, they did not understand that the burden was theirs. They had this presumption, and that's all that they had, and we overcame that presumption. If you look at page 42 of their reply brief, pages 7, 12, and 14 of their reply brief, they mistake their burden. At page 14 of their reply brief, they state, and I quote, the burden was not on the appellants to prove diversions that benefited Volkman. That's a total mistake. The burden is always on them. They may have a presumption, a rebuttable presumption, but the burden always remained on them, and they did not meet their burden. They didn't show any nefarious conduct that diverted any money from the estate at all. The judge was very clear. He went through there. He knew the law. He said that the presumption had been overcome. Yeah, just to make it very direct and simple, how was that presumption, from your perspective, overcome? Well, for instance, the loans to Linda's adult children. The court found, and it was undisputed, the evidence, clear and convincing evidence, Joyce had been giving loans to family members since 1970. We're talking about 2012, 2014, that era, including the petitioners, as I mentioned, including their spouses, including Joyce's daughters and son, everything from weddings to buying cars and trucks and homes and college expenses. The petitioners used their money to go to college. They got an interest-free loan. They never signed a note. It was always understood that there was a loan, and the loans were... So we're talking about pattern and practice of the deceit. Right, right, and I've quoted cases in language from the Power of Attorney Act that says if you know the plan of the ward, it's your obligation to pursue that plan. Okay. Okay, so there's no difference between the petitioners getting loans and Linda's adult children getting loans. It's the same pattern. Similarly, with the missing checks, there was no evidence that that money got diverted in any way to Linda's benefit or to her children. The testimony wasn't. It's not just Linda's self-serving testimony. And when you talk about family, yeah, it's Joyce's son, Joyce's daughter. They all testified, and even the petitioner. I think it was one of the petitioners that actually found the $10,000 that was in Joyce's possession. We talk about the safe in the house, you know, the safe in the house. You can't account for any money because Joyce put the money in a safe. When the petitioner found that $10,000, do you think she deposited it into Joyce's bank account? No, she took it home and put it in the safe. I'm sure that there's not an exact accounting of the money coming in and out of that safe because Joyce would, you know, as I said, on one occasion she went shopping and she took $3,000 in cash in her purse. It's just the nature of the woman and the time that she lived in. So, that being said, you know, I think they're unsuccessful because they didn't understand their burden. Justice had an interesting question when they said, well, you're going to ask for damages, what do you want? And, you know, if you look at the trial transcript, they were forever speculating about, well, you know, let's round this up from 218, let's make it, you know, $30,000 or $300,000. You know, there were numbers all over the place. There was no way that some judge could fix an amount because by their own admission they weren't able to quantify any damages or show in any way that her estate had been diminished in any way, in any amount of money. I think that makes them unsuccessful. And so, unless there's some further questions, I'm just asking this court to affirm the... No, no questions. There are no questions from the court. Thank you. I interrupted you. No, thank you. Oh, go ahead. Mr. Dineen, you may reply. Well, first thing I'll say, this is the second time in this proceeding Mr. McClintock's accused me of being unethical. The first time Judge Heddle soundly knocked him down. A couple of things. The most important thing is you need to accept what he says as to the who needs to prove what and what we said in our brief. We went through the test of what we need to prove for breach of fiduciary duty, that there was a fiduciary relationship, and he won't even acknowledge that Gerolus and the other cases are correct. There's a breach of the fiduciary duty, damages, and the nexus between the two. It's presumed if money disappears that there is a nexus. That's what we had to prove. He also says we speculated. Well, of course we speculated. We had to because Linda did not account. She didn't keep records. She didn't do anything. He mentions the cash. She said she never kept track of the cash that either went into the safe or came out, and it's gone with an elderly person that she was watching in her home. And then if you take a look at the accounting, when Joyce went to the nursing home, there was no large deposit from the safe. She didn't need the cash at the nursing home. A few other things, so it gets down to that. First he said go to a lawyer, do what you want. Well, she went to a lawyer. She got an immediate power of attorney agent. The lawyer didn't list under special powers to make loans. The Power of Attorney Act says you can't make loans. The notice to agents says you can't make loans. The loans were illegal. Tom can talk all he wants about mom wanted to do it. Well, two things. Number one, that was mom's money, not Linda's money. Number two, Linda took all that loans, and they went to one of five branches of the family. That's under Polinsky. And if you take a look also, the probate estate didn't have much at all in it. Linda had pretty much everything. All I had was the obligation to pay. Just in closing, a few other quick comments. Joyce did benefit from what the petitioners did. Because Heartland Bank became involved. The undocumented gifts became loans. That helped Joyce out, not for the 40,000 remaining with Michael, but for $178,500. That was now an asset that Joyce's estate was able to recover. For the retirement checks, once again, we tried to track them to Joyce's account. Tom says you haven't proven they went to Linda's account. The main thing is they didn't go to Joyce's account. The cash, that's all over the place also. I would point out she's never said where the cash is going to go. Just some final matter. He also keeps going back, and I had notes here. We knew he would try to use his interpretation of the Power of Attorney Act. But if you take a look at the Collins case, paragraph 39 that we cited, they disagree. One other thing to consider. Garrelis, at 40, emphasizes that competency is not the issue. It's whether the transactions were fraudulent. They went the other way. Just in closing, a few different comments. First, disabled persons are to be given special protections by the courts to protect their interests. Next, there's a Latin term, fedes, F-I-D-E-S, servanda est. Faith must be observed. An agent must not violate the confidence imposed on her. The court should look at Meinhart v. Salmon, quoted in the Nonass case. It's a Cardozo opinion dealing with the duty of loyalty. And we would also go back to Judge Earl Hoover's article that deals with the duty of loyalty. And rephrasing page 20 of our reply brief, the appellate court, this appellate court that has been very aggressive in combating fiduciary fraud through Talti, through Spring Valley, and the others, it should not unconsciously lower the level of conduct for a fiduciary and to appropriately apply the laws. Please correct the trial court's refusal to do so. The court found fiduciary violations but said, I'm not going to award damages. I've suggested the court could, after reviewing the transcripts, award damages or it can be sent back. But this person who violated the trust and confidence over a period of several years with clearly illegal conduct should not just get a slap on the wrist. Thank you. Questions? No. Okay. Well, thank you, Counsel Bolt, for your arguments in this matter this afternoon. And we take it under advisement and the written disposition shall issue. The court will stand in brief recess.